## IN THE UNITES STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE,
## NASHVILLE DIVISION

| | | |
|---|---|---|
| TARA L. KEEN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Case No. 3:17-cv-00982 |
| vs. | ) | |
| | ) | Hon. Judge Waverly D. Crenshaw |
| OCWEN LOAN SERVICING, LLC and | ) | |
| ROBERT C. HELSON, | ) | |
| | ) | |
| **Defendants.** | ) | |

---

### FIRST AMENDED COMPLAINT

---

Plaintiff Tara L. Keen ("Ms. Keen") brings this action against Defendants Ocwen Loan Servicing, LLC and Robert Helson ("Ocwen" and "Mr. Helson," respectively) because her home was wrongfully sold at a foreclosure sale on April 5, 2017. In wrongfully foreclosing on her home, Ocwen committed numerous loan servicing errors and failed to comply with the Federal Real Estate Settlement Procedures Act (RESPA), RESPA's governing regulations (Regulation X), and the Home Affordable Modification Program (HAMP) servicing guidelines. Because the sale was conducted as part of a wrongful foreclosure, the sale should be set aside and the purchaser, Mr. Helson, should be given a full refund.

By this Complaint, Ms. Keen seeks to undo this wrongful foreclosure, set aside the sale, and have her mortgage loan reinstated. Ms. Keen also seeks to recover damages from Ocwen based on its numerous violations of statutory and common law, including violations of RESPA, violations of the Consumer Financial Protection Bureau's (CFPB) regulations, violations of the Home Affordable Modification Program (HAMP) and its servicing guidelines, promissory

estoppel, and breach of contract. Ms. Keen also seeks to recover for the emotional distress she has suffered as the result of Ocwen's wrongful foreclosure.

## JURISDICTION AND VENUE

1)      This matter was originally filed in the Circuit Court of Tennessee's Eighteenth Judicial District on June 2, 2017. On June 27, 2017, upon Mr. Helson's notice filed pursuant to 28 U.S.C. § 1446, the matter was removed to the United States District Court for the Middle District of Tennessee.

2)      This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1441(c), and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601, *et. seq.*.

3)      Although Ocwen is a non–resident of the State of Tennessee, Ocwen routinely conducts business within the State; thus, this Court has personal jurisdiction over Ocwen pursuant to Rule 4 of the Federal Rules of Civil Procedure and Tenn. Code Ann. § 20–2–214(a)(1) & (5).

4)      This Court has personal jurisdiction over Mr. Helson as he is a resident of the State of Tennessee and routinely conducts business in the State of Tennessee.

5)      Each cause of action alleged herein arose from facts that occurred or substantially occurred in Sumner County, Tennessee; thus, venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391.

## PARTIES

6)      Plaintiff Tara L. Keen is an adult who currently resides in Allen County, Kentucky. At the time this action was first commenced, her address was 1235 Brandy Hollow Road, Portland, Tennessee, 37148 ("the home"). The home was purchased in 1998 by Ms. Keen and her late ex–husband, Nathan Keen, as joint tenants with rights of survivorship. Ms. Keen and Nathan Keen

2

divorced in October 2011 and Ms. Keen was granted a 100% title interest in the home in the Final Decree of Divorce. Nathan Keen later executed a quitclaim deed for his interest in the property naming Ms. Keen the Grantee. The Quitclaim Deed has been recorded with the Sumner County Register of Deeds as Instrument No. 106821.

7) Defendant Ocwen Loan Servicing, LLC, a corporation, is incorporated in the State of Delaware and maintains its headquarters in West Palm Beach, Florida. The address of its principal place of business is 1661 Worthington Road, Suite 100, West Palm Beach, Florida, 33409–6493. Ocwen is licensed to do business in the State of Tennessee. Its registered agent is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203–1312. Ocwen is primarily engaged in the business of mortgage loan servicing. Upon information and belief, Ocwen services hundreds of mortgages in the State of Tennessee, including the mortgage which, until the foreclosure sale on April 5, 2017, secured Ms. Keen's home.

8) Defendant Robert C. Helson is an individual who, upon information and belief, resides in Sumner County, Tennessee. Mr. Helson receives mail at P.O. Box 1372, Gallatin, Tennessee, 37066. Mr. Helson purchased Ms. Keen's home at a foreclosure sale on April 5, 2017. Although Ms. Keen does not allege Mr. Helson is guilty of any wrongdoing, he is an essential party to this lawsuit.

**ALLEGATIONS OF FACT**

9) At all times relevant to this Complaint and until the foreclosure sale on April 5, 2017, Ocwen was the servicer to the mortgage loan which secured the property at issue.

10) The home was purchased by Ms. Keen and her late ex–husband, Nathan Keen, on June 8, 1998. At the time of the purchase, Ms. Keen and Nathan Keen each signed the Deed of Trust (Instrument No. 433453), each initialed every page where indicated, and both were

3

collectively identified as "Borrower" in the Deed of Trust. However, Ms. Keen did not sign the mortgage Note executed the same day and referenced in the Deed of Trust. Ms. Keen and Nathan Keen were co–owners of the home and Ms. Keen was a co–signatory to the Deed of Trust.

11)     The original lender of the loan secured by the home was NF Investments, Inc.

12)     On or around May 9, 2011, while Nathan Keen and Ms. Keen were still married, the mortgage on the home and the Note secured by the mortgage, which was then being serviced by GMAC Mortgage, LLC, was modified to include Ms. Keen as a named borrower. *See* "May 9, 2011 Modification Agreement", attached as Exhibit 1. Ms. Keen signed this Modification Agreement as a borrower to the mortgage Note.

13)     By signing the modified mortgage Note as a named borrower, Ms. Keen became a named borrower on the loan.

14)      Ms. Keen and Nathan Keen divorced in October 2011. Ms. Keen was granted a 100% title interest in the home in the Final Decree of Divorce. Nathan Keen later executed and recorded a Quitclaim Deed (Instrument No. 106821) naming Ms. Keen the Grantee of any interest he held in the home. In 2013, Nathan Keen passed away.

15)     By 2013, Ms. Keen was the sole interest holder in the property and the only living person obligated under the mortgage as a borrower. Ms. Keen maintained this status until the April 5, 2017 foreclosure sale.

16)     Following the divorce, Ms. Keen continued to make mortgage payments to Ocwen in her name. Following Nathan Keen's death, Ms. Keen informed Ocwen of his passing and sent in the copy of his death certificate that it requested.

17)     In early 2016, Ms. Keen experienced financial hardship after her mother, father, and brother all died unexpectedly within weeks of each other. The expenses that resulted from and

4

followed this event caused Ms. Keen to get behind on her mortgage payments. In March or April of 2016, Ms. Keen contacted Ocwen about potential options for avoiding foreclosure and bringing the mortgage current.

18) During this and future conversations, Ocwen representatives told Ms. Keen that she was not a borrower on the loan and would only be treated as an authorized third party.

19) During at least one conversation with an Ocwen representative, Ms. Keen insisted that she was indeed a borrower on the loan. The Ocwen representative(s) told her they would look into the matter. Each time Ms. Keen was informed that their research did not show she was a named borrower.

20) On or around April 14, 2016, Ocwen sent Ms. Keen a 26–page packet informing her that assistance was available, detailing options and instructions, and including a full application for mortgage assistance. The application was addressed only to Nathan Keen.

21) Ms. Keen completed and submitted the request for mortgage assistance (RMA) application.

22) On June 4, 2016, Ocwen sent Ms. Keen a "Family Transfer Package" which she was told she needed to fill out in order to assume the loan. The Family Transfer Package included an Assumption of Liability Agreement. *See* "Family Transfer Package", attached as Exhibit 2.

23) Although Ms. Keen was already a borrower to the loan per the May 9, 2011 Modification Agreement, she promptly completed and submitted the Family Transfer Package because she was told it was required.

24) On June 6, 2016, Ms. Keen received a letter from Ocwen addressed to Nathan Keen stating that her request for mortgage assistance had been approved for a Home Affordable Modification Program (HAMP) modification. *See* "June 6, 2016 Modification Approval Letter",

5

attached as Exhibit 3. The letter further explained that before a permanent modification could be offered, the modification process first required the completion of a trial period plan. Under the trial period plan, the monthly mortgage payment was reduced to $526.37, a reduction of over $300 from the current monthly payment. The letter explained that the modification offer could be accepted by making the first trial period payment by July 1, 2016, at which point the terms detailed later in the letter would become effective. The letter additionally explained that after all trial period payments were made and requested documents were submitted, the mortgage would be permanently modified according to the included terms. Ms. Keen sent in her first trial period payment within the prescribed time thereby accepting Ocwen's offer. Through the proffer and acceptance of the trial period plan, Ms. Keen and Ocwen agreed to the following terms, among others:

    a. If Ms. Keen accepted and continued to otherwise comply with the terms of the trial period plan, Ocwen would not proceed to foreclosure sale during the trial period;

    b. All terms of the Deed of Trust and Note would remain in effect during the trial payment period other than the reduced payment;

    c. If Ms. Keen complied with all provisions of the trial period plan, Ocwen would provide her with a permanent modification that would amend and supplant the Deed of Trust and Note;

    d. To keep the modification, Ms. Keen might be required to provide additional documentation to prove her eligibility, and Ocwen reserved the right to revoke the offer or terminate the trial period plan if they learned of information that would make her ineligible for the trial payment plan or permanent loan modification;

6

e. If she was not required to pay escrow amounts previously, she was now required to do so, and by accepting the offer she agreed to the creation of an account and to pay required escrow amounts into it.

25) Ms. Keen accepted the terms of the trial payment plan, signed the trial period plan as the borrower, and began making monthly trial payments as required.

26) In early September 2016, three months into her trial payment plan, Ms. Keen received a letter from Ocwen including an urgent alert. *See* "August 30, 2016 Urgent Alert Letter", attached as Exhibit 4. The letter was addressed to both Nathan Keen and Tara Keen. The letter said an issue with "your identity" had been discovered that prevented confirmation of the loan's eligibility for a HAMP modification. The letter said documentation was required to verify Ms. Keen's identity and that she must immediately send a copy of her valid driver's license, a copy of her social security card, a copy of her birth certificate, a signed and notarized declaration from her that the information provided was true and correct, and any other documentation to confirm her social security number. Ocwen required that the documents be received on or before September 14, 2016.

27) Ms. Keen promptly collected and faxed the requested documents to Ocwen.

28) Upon receipt of her documents, a representative of Ocwen contacted Ms. Keen, told her to stop making payments under the trial payment plan, and informed her that she would need to assume the mortgage loan from her deceased ex–husband in order to be eligible for the assistance she had been granted in June.

29) Ocwen again sent Ms. Keen a "Family Transfer Package" to "facilitate the transfer of the mortgage loan" to herself. This package listed forms and documents that it said were "needed to complete the loan transfer." Although already obligated under the Note as a named

7

borrower per the May 9, 2011 Modification Agreement, Ms. Keen completed the forms and collected the documents requested and sent them to Ocwen multiple times via fax, email, and mail, each of the methods listed in the package. Ms. Keen also sent the documents in via mobile apps at the instruction of Ocwen representatives.

30)     Ms. Keen never received confirmation that she had assumed the loan; however, in October of 2016 she received a new letter with mortgage assistance resources, similar to the one she had received in April following her first inquiry, but unaccompanied by a new application.

31)     Ms. Keen continued to contact Ocwen to see what could be done to avoid foreclosure.

32)     Ocwen representatives repeatedly told her that she needed to fill out and return the "Family Transfer Package" in order to assume the loan. Ms. Keen did so several times.

33)     In addition to being told that her loan modification could not be approved, Ms. Keen was also told multiple times that she could not continue making mortgage payments until she had assumed the loan.

34)     Ocwen never acknowledged Ms. Keen as the borrower, nor did they acknowledge that she had assumed the loan.

35)     Despite her many attempts to be acknowledged as a borrower, or at the very least to have her assumption of the loan acknowledged, Ocwen proceeded with the foreclosure process in the Spring of 2017. Ocwen treated and referred to Ms. Keen only as an "authorized third party" throughout this process.

36)     At the end of March, 2017, Ms. Keen received a letter from Trustee Wilson & Associates, PLLC, stating that her home was scheduled for a foreclosure sale on April 5, 2017,

8

less than a week away. This came as a surprise to Ms. Keen and she immediately contacted Ocwen. Ocwen representatives assured her Ocwen was still trying to help her assume and modify the loan.

37) Still concerned, Ms. Keen began contacting attorneys for help to prevent the sale, but was unsuccessful in securing legal assistance at that time with such short notice.

38) Following her conversation with Ocwen, she received yet another letter from Ocwen dated March 31, 2017, with mortgage assistance resources and information. This letter was again unaccompanied by a new application.

39) On April 5, 2017, the home was sold to Mr. Helson for $85,063. Mr. Helson recorded the Trustee's Deed (Instrument No. 1191442) on April 12, 2017.

40) On April 7, 2017, Ms. Keen received a letter from Ocwen dated April 3, 2017, which said it had completed its review of her application for mortgage assistance and determined that she was not eligible for a loan modification through HAMP, Ocwen's Shared Appreciation Modification Program (SAM), or Ocwen's Proprietary Modification Program. *See* "April 3, 2017 Modification Denial Letter", attached as Exhibit 5. The letter went on to explain she was denied assistance for the modifications because there was a foreclosure sale scheduled within seven business days and that she was also denied assistance through HAMP and SAM for the additional reasons that the programs were both retired on December 31, 2016.

41) On April 17, 2017, Mr. Helson filed a detainer warrant against Ms. Keen in Sumner County General Sessions Court.

42) Upon request from Ms. Keen, the detainer warrant was removed to Sumner County Circuit Court on June 8, 2017.

43) Upon notice of Mr. Helson, this matter was removed from Sumner County Circuit Court on June 27, 2017.

9

44)    With regard to the detainer warrant filed by Mr. Helson, the Sumner County Circuit Court records show that no judgment has been entered and the case is still open.

45)    On or about September 6, 2017, the Sumner County Circuit Court entered an Order requiring Ms. Keen to vacate the home. This does not appear to be a final order.

46)    Ms. Keen vacated the home on September 7, 2017.

## CLAIMS FOR RELIEF

### COUNT 1
### Wrongful Foreclosure Resulting from
### Violations of RESPA and Regulation X (12 U.S.C 2601, et seq.; 12 C.F.R. Part 1024)

47)    The allegations of paragraphs 1–46 are realleged and incorporated herein as reference.

48)    RESPA (12 U.S.C. § 2601, *et. seq.*) and its governing regulations (Regulation X, 12 C.F.R. Part 1024) establish the requirements for how a mortgage loan servicer or lender must conduct its servicing of the loan.

49)    RESPA includes a cause of action that borrowers may bring against "[w]hoever fails to comply with any provision of this section." 12 U.S.C. § 2605(f). Individual borrowers may receive, for each such failure, any actual damages resulting from the failure as well as any additional damages, up to $2,000, "in the case of a pattern or practice of noncompliance" with RESPA's requirements. 12 U.S.C. § 2605(f)(1).

50)    This provision may also be used by borrowers to enforce the loss mitigation requirements in Regulation X. 12 C.F.R. Part 1024.41(a). Additionally, RESPA contains a broad provision that prohibits servicers from failing to comply with any other obligation in the Consumer Financial Protection Bureau (CFPB) regulations necessary to carry out the consumer protection purposes of RESPA. 12 U.S.C. § 2605(k)(1)(E).

10

51)     One of the most important obligations imposed on mortgage loan servicers is the requirement that they affirmatively consider loss mitigation before foreclosure. 12 C.F.R. § 1024.41(c).

52)     Servicers must acknowledge the receipt of a loss mitigation application from a borrower, review it for completion, notify the borrower as to whether the application is deemed complete, and if the application was deemed incomplete, specify what is required from the borrower to make it complete and by when. 12 C.F.R. § 1024.41(b).

53)     If a servicer receives a complete application within 120 days of a borrower's delinquency or before the servicer has given the first notice in a foreclosure process, the servicer is prohibited from giving the first notice unless (1) it has sent a notice of non–eligibility for any assistance options to the borrower and the borrower is not entitled to an appeal under the circumstances or has been denied an appeal, (2) the borrower rejects all options offered, or (3) the borrower fails to perform under an agreement or loss mitigation option. 12 C.F.R § 1024.41(f)(2). Similarly, if the borrower submits a complete application more than 37 days before a foreclosure sale is scheduled, the servicer is prohibited from conducting the sale unless one of the same exceptions applies. 12 C.F.R § 1024.41(g).

54)     Per the May 9, 2011 Modification Agreement, Ms. Keen was a borrower on the loan she sought to have modified through the loan's servicer, Ocwen.

55)     Ms. Keen sought mortgage assistance through HAMP while the HAMP program was still in effect.

56)     Ms. Keen submitted a complete loss mitigation application nearly a year before the foreclosure sale occurred. She followed every subsequent instruction Ocwen gave her and submitted everything requested.

11

57)     Although Ms. Keen was initially approved for a HAMP modification, she was later denied because Ocwen failed to properly identify her as a borrower to the loan.

58)     Ocwen failed to accurately process Ms. Keen's loan modification application, resulting in the denial of mortgage assistance for which she was eligible and legally entitled to receive.

59)     Additionally, Regulation X requires a servicer to initiate and maintain active communications with a borrower, beginning at the 36th day of the borrower's delinquency. 12 C.F.R § 1024.39.

60)     Ms. Keen did not receive any notice from Ocwen that the loan on her home had been placed in the foreclosure process or was scheduled for a sale.

61)     If Ocwen deemed her application incomplete at any point after the trial payment period began, it was Ocwen's obligation to inform her of this and inform her of what steps she would need to take to complete it. 12 C.F.R § 1024.41.

62)     At a minimum, Ocwen was obligated to inform Ms. Keen that she was not eligible for any assistance before completing a foreclosure sale of her home. 12 C.F.R § 1024.41.

63)     Ocwen has engaged in a pattern or practice of non–compliance with the requirements of the loss mitigation procedures and mortgage servicing provisions of RESPA as set forth in 12 U.S.C. § 2605 and 12 C.F.R. § 1024.41.

64)     Accordingly, Ms. Keen is entitled to recover from Ocwen "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of [12 U.S.C. § 2605] not to exceed $2,000" for each such occasion under 12 U.S.C. § 2605(f)(1)(B).

65)    Ms. Keen is also eligible to recover any actual damages she has suffered or will suffer, including damages for emotional distress, as the result of Defendant Ocwen's violations. 12 U.S.C. § 2605(f)(1)(A).

**COUNT 2**
**Wrongful Foreclosure Resulting from Violations of HAMP**

66)    The allegations of paragraphs 1–65 are realleged and incorporated herein as reference.

67)    Ocwen participated in the Home Affordable Modification Program (HAMP) developed by the U.S. Department of Treasury. HAMP was implemented on March 4, 2009, and expired on December 31, 2016.

68)    As a participant in HAMP, Ocwen was required to comply with the rules contained in the Treasury Department's Making Home Affordable Handbook (MHA Handbook) in regard to servicing applications for loss mitigation that it received while the program was in effect.

69)    As a participant in HAMP, Ocwen was required to evaluate all loss mitigation applications that were submitted on or before December 31, 2016, under the HAMP guidelines. In fact, assuming Ms. Keen is not legally considered a borrower on the Note, the MHA Handbook obligated Ocwen to consider Ms. Keen for a loan modification while simultaneously processing the loan assumption. *See* MHA Handbook v5.1, Chpt. II, Sec. 8.8 ("Consideration of Non-Borrowers Following Death or Divorce").

70)    Additionally, the MHA Handbook required Ocwen to grant Ms. Keen a permanent modification if she made all her payments on time during the trial period and complied with the other terms of the trial payment plan.

71)    Ms. Keen made all of her trial period plan payments and fully complied with all provisions of the trial period plan.

13

72) Ms. Keen was only denied a permanent modification due to an error on the part of Ocwen.

73) Because Ms. Keen submitted her loss mitigation application prior to December 30, 2016, and because Ocwen is a participant in HAMP, Ms. Keen was entitled to be considered for a HAMP modification before her home could be sold at foreclosure.

74) Ocwen's initial approval and subsequent denial of Ms. Keen's HAMP modification was without basis and this error directly resulted in the wrongful foreclosure of Ms. Keen's home.

75) Ocwen's initial approval and subsequent denial of Ms. Keen's HAMP modification is a violation of HAMP whether Ms. Keen is considered an actual borrower on the loan or a non-borrower successor in interest.

76) These violations of HAMP also constitute servicing errors under RESPA. 12 C.F.R. § 1024.35(b)(11).

77) Ocwen's servicing errors under RESPA entitle Ms. Keen to recovery of actual damages, statutory damages, reasonable attorney's fees, and court costs. 12 U.S.C. § 2605(f).

### COUNT 3
### Breach of Contract

78) The allegations of paragraphs 1–77 are realleged and incorporated herein as reference.

79) The Deed of Trust and Note constituting the mortgage secured by the home create an enforceable contract between Ocwen and Ms. Keen.

80) Pursuant to the May 9, 2011 Modification Agreement, Ocwen was contractually obligated to recognize Ms. Keen as a borrower to the Note.

81) Ocwen's failure to recognize Ms. Keen as a borrower to the Note constitutes a breach of contract.

14

82) Ocwen's breach of contract led to the wrongful foreclosure of Ms. Keen's home.

83) Ocwen's breach of contract entitles Ms. Keen to set aside the foreclosure sale and seek any actual damages she has suffered as a result of the wrongful foreclosure.

## COUNT 4
### Breach of Contract for Failure to Follow HAMP Provisions

84) The allegations of paragraphs 1–83 are realleged and incorporated herein as reference.

85) Although Ms. Keen complied with the borrower documentation requirements of HAMP, Ocwen never completed the required analysis to determine whether she was entitled to a HAMP trial period or any other loss mitigation option nor did Ocwen uphold its obligations under HAMP once the trial period plan began.

86) By participating in HAMP, Ocwen agreed to properly evaluate all eligible borrowers in default or at risk of default for loss mitigation options before foreclosing on the property.

87) The agreement to abide by HAMP provisions was made pursuant to a Servicer Participation Agreement (SPA) with the Treasury Department. In exchange for Ocwen's participation in HAMP, the federal government offered it financial incentives.

88) Because the HAMP program existed for the purpose of benefitting borrowers who face foreclosure, Ms. Keen may enforce these contractual duties as a third–party beneficiary to the SPA.

89) Ms. Keen may enforce these contractual duties regardless of whether she is an actual borrower or a non-borrower successor in interest because the HAMP program requires servicers like Ocwen to assist applicants like Ms. Keen by "process[ing] the assumption and loan

15

modification contemporaneously . . ." MHA Handbook v5.1, Chpt. II, Sec. 8.8 ("Consideration of Non-Borrowers Following Death or Divorce").

90) Even if Ms. Keen is only considered a non-borrower successor in interest, she is still entitled to the protections of HAMP in relation to loan modification.

91) Ms. Keen seeks to set aside the April 5, 2017 foreclosure sale due to Ocwen's failure to evaluate Ms. Keen's request for mortgage assistance in accordance with HAMP and its SPA with the Treasury Department.

92) Ms. Keen also seeks to recover her actual damages stemming from Defendant's breach of the SPA and refusal to abide by the provisions of HAMP.

## COUNT 5
## Promissory Estoppel

93) The allegations of paragraphs 1–92 are realleged and incorporated herein as reference.

94) Ocwen promised Ms. Keen on multiple occasions that she had completed her application or was only one step away from completion, only to sell her home at foreclosure instead and without notice. This was in direct contradiction to the promises that Ms. Keen's application for mortgage assistance had been approved, that future applications would be appropriately processed, or that completion of the Family Transfer Package was all that was necessary for her to assume the loan.

95) Additionally, Ocwen promised Ms. Keen that if she complied with the terms of the trial period plan, she would be approved for a permanent modification, only to later tell her that she could not be approved for a permanent modification despite her successful completion of the trial period plan.

16

96)    Ms. Keen relied on these promises to her detriment, and she did not learn that the promises were false until her home had been sold.

97)    Because Ocwen promised Ms. Keen that her application was complete, that completion of the assumption agreement was all that was required for her to assume the loan, and that she would be granted a permanent modification if she complied with the terms of the trial period plan, it should have been estopped from referring her home for foreclosure and allowing the sale.

98)    Ms. Keen has the right to set aside the foreclosure sale.

99)    Ms. Keen also has the right to recover any damages resulting from her detrimental reliance on Ocwen's promises.

### COUNT 6
### Fraud

100)    The allegations of paragraphs 1–100 are realleged and incorporated herein as reference.

101)    In dealing with Ms. Keen's Request for Mortgage Assistance, Ocwen made an intentional misrepresentation of a material fact: that Ms. Keen was not a named a borrower on the Note and therefore not entitled to mortgage assistance under RESPA and/or HAMP.

102)    Ms. Keen was in fact a named borrower on the Note per the May 9, 2011 Modification Agreement.

103)    Ocwen's misrepresentation was made with knowledge of its falsity.

104)    Ms. Keen relied on this representation to her detriment.

105)    Ocwen's misrepresentation constitutes a misrepresentation of an existing or past fact.

17

106)   Ocwen's misrepresentation resulted in the wrongful foreclosure of Ms. Keen's home.

107)   As a result of Ocwen's fraudulent misrepresentation, Ms. Keen is entitled to recovery of her actual damages plus appropriate punitive damages.

## COUNT 7
## Negligent Misrepresentation

108)   The allegations of paragraphs 1–108 are realleged and incorporated herein as reference.

109)   As stated above, Ocwen misrepresented to Ms. Keen that she was not an actual borrower on the loan under the May 9, 2011 Modification Agreement.

110)   This misrepresentation was used to guide Ms. Keen in understanding her rights related to loan modification and assumption.

111)   The information supplied to Ms. Keen regarding her status as a borrower on the Note was false.

112)   Ocwen did not exercise reasonable care in obtaining or communicating the information regarding Ms. Keen's status as a borrower on the Note.

113)   Ms. Keen justifiably relied on this information.

114)   As a result of Ocwen's negligent misrepresentation, Ms. Keen is entitled to be compensated for her actual damages sustained and placed in the same position that she would have been had the misrepresentation not occurred.

## COUNT 8
## Wrongful Foreclosure Resulting from
## Failure to Recognize Assumption under Garn–St Germain

115)   The allegations of paragraphs 1–114 are realleged and incorporated herein as reference.

18

116) This Count is pled in the alternative in the event that Ms. Keen is found not to have been a legal borrower on the Note per the May 9, 2011 Modification Agreement.

117) Throughout this process Ocwen has failed to recognize and treat Ms. Keen as the successor in interest to the home, in violation of the Garn–St Germain Depository Institutions Act of 1982 ("Garn–St Germain" or "the Act") and Regulation X. 12 U.S.C. § 1701j–3(b)(2); 12 C.F.R. § 1024.30(d).

118) Ocwen has also failed to recognize that Ms. Keen has assumed the loan securing the home.

119) Under Garn–St Germain, Ms. Keen was able to freely assume the loan, whether or not she had completed the "Family Transfer Package" that she in fact did complete and submit multiple times to Ocwen. Ocwen's prior approval of the assumption was and is not required.

120) Garn–St Germain provides that a lender's exercise of a due on sale clause in a mortgage loan is governed exclusively by the terms of the contract, subject only to limitations contained in the Act. 12 U.S.C. § 1701j–3(b)(2).

121) Though the general rule from Garn–St Germain is that due on sale provisions are enforceable, the Act explicitly limits the use of due on sale clauses by prohibiting their enforcement after certain non–substantive or non–sale transfers. 12 U.S.C. § 1701j–3(d). These transfers are known as Garn–St Germain–exempt transfers, and include transfers between spouses upon divorce or the death of one spouse.

122) Once a transfer of an interest in real property renders the mortgage's due on sale clause unenforceable, the mortgage loan securing the real property is freely assumable by the transferee. 12 U.S.C. § 1701j–3(b)(3).

19

123)    The loan is also freely assumable under state contract law because, absent an enforceable due on sale clause, there is nothing in the mortgage loan preventing the loan's assumption.

124)    The loan is freely assumable by Ms. Keen because she obtained her interest in the home under a Garn–St Germain–exempt transfer. 12 U.S.C. § 1701j–3(d)(7). As a third–party beneficiary to the assumption agreement, Ocwen is not entitled to force, block, or control the terms of an assumption absent a contractual provision in the note or Deed of Trust with the original borrower. Because the due on sale clause contained in the mortgage is unenforceable, there is no contract provision restricting Ms. Keen's ability to assume the loan.

125)    Ocwen must recognize Ms. Keen's assumption of the loan because she has both communicated her intent to be obligated under the terms of the loan and provided Ocwen with a signed assumption agreement.

126)    Ms. Keen clearly intended to assume the loan upon her divorce because she continued to make the payments, notified Ocwen of Nathan Keen's death, sought a modification after later suffering a financial hardship, and completed and submitted the Family Transfer Package multiple times. While assent to assume the obligations of a mortgage should not be presumed, there is no set formula for the completion of an assumption. No writing is required.

127)    Ocwen's refusal to recognize Ms. Keen's assumption of the loan and offer all the protections afforded to borrowers by RESPA, Regulation X, and HAMP constitutes enforcement of the Deed of Trust's due on sale clause in violation Garn–St. Germain.

128)    Ocwen's failure to recognize Ms. Keen's assumption of the loan is a servicing error under RESPA. 12 C.F.R. § 1024.35(b)(11).

20

129) Ocwen's servicing error under RESPA entitles Ms. Keen to recovery of actual damages, statutory damages, reasonable attorney's fees, and court costs. 12 U.S.C. § 2605(f).

### COUNT 9
### Breach of Contract for Failure to Recognize Assumption

130) The allegations of paragraphs 1–129 are realleged and incorporated herein as reference.

131) This Count is pled in the alternative in the event that Ms. Keen is found not to have been a legal borrower on the Note per the May 9, 2011 Modification Agreement.

132) At Ocwen's request, Ms. Keen signed a loan assumption agreement (the "Family Transfer Package").

133) Ocwen told Ms. Keen that completing the package was all that was needed in order for Ocwen to recognize her assumption of the loan.

134) Ms. Keen's completion of the Family Transfer Package contractually obligated Ocwen to recognize her assumption of the loan.

135) Ocwen did not recognize Ms. Keen's assumption of the loan before it sold her home at foreclosure.

136) Additionally, the Deed of Trust, to which Ms. Keen was a co–signatory, contains a provision that explicitly binds and benefits successors and assigns of both the lender and the borrower to the terms of the Deed of Trust, one of which prohibits the lender from accelerating the loan and proceeding to foreclosure without providing notice of default and an opportunity to cure.

137) Ocwen's failure to recognize Ms. Keen's assumption of the loan was in error and directly resulted in the foreclosure of her home.

21

138) Ocwen's continued refusal to recognize Ms. Keen's assumption despite the signed loan assumption agreement constitutes breach of contract and entitles Ms. Keen to damages stemming from the breach.

139) Ocwen's continued refusal to recognize Ms. Keen as a borrower bound and benefitted by the terms of the Deed of Trust constitutes breach of contract and entitles Ms. Keen to damages stemming from the breach.

## COUNT 10
### Infliction of Emotional Distress

140) The allegations of paragraphs 1–139 are realleged and incorporated herein as reference.

141) Defendant Ocwen wrongfully foreclosed on Ms. Keen's home.

142) Ocwen knew or should have known that emotional distress would follow from its conduct.

143) As a direct and proximate result of Ocwen's conduct, Ms. Keen has suffered and continues to suffer severe and serious emotional injury.

144) Ocwen's infliction of emotional distress was intentional, reckless, or negligent.

145) Due to Ocwen's conduct, Ms. Keen now seeks all appropriate equitable relief to which she is entitled in addition to actual and punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Ms. Keen respectfully requests that this Honorable Court:

A. Set aside the foreclosure sale, declare the Trustee's Deed (Instrument No. 1191442) void, and reinstate her mortgage loan;

B. Declare that Ms. Keen is a borrower on the loan in accordance with the May 9, 2011 Modification Agreement;

22

C. Alternatively, declare that Ms. Keen assumed the loan pursuant to the Garn–St Germain Depository Institutions Act of 1982 and the previously executed Assumption of Liability Agreement included in the Family Transfer Package;

D. Order the removal of all fees, charges, and interest arising from the wrongfully instituted foreclosure proceedings and subsequent foreclosure from Ms. Keen's account;

E. Award Ms. Keen her actual damages and statutory damages against Ocwen;

F. Award Ms. Keen all punitive damages which she is entitled to recover;

G. Require Ocwen to pay for all court costs associated with this action, including discretionary costs;

H. Require Ocwen to pay for reasonable attorneys' fees and expert fees;

I. Order that a *lis pendens* be recorded to protect the interests of Ms. Keen; and

J. Provide any and all further relief as this Court deems just and proper.

Respectfully submitted,

Kerry Dietz, BPR No. 035112
Samuel Keen, BPR No. 033865
Legal Aid Society
106 Public Square, Suite 109
Gallatin, Tennessee 37066
Phone: (615) 451–1880 ext. 356
Fax: (615) 230–9952

*Counsel for Plaintiff, Tara L. Keen*

DATED: ~~December~~ February 15, 2018 ~~, 2017~~

23